Stanley SHEPPARD, Plaintiff,

v.

Robert ALOISI, et al., Defendants.

No. CIV.A.03–10240–JGD.

United States District Court,
D. Massachusetts.

Aug. 11, 2005.

**480**

Lawrence W. Frisoli, Frisoli & Frisoli, Cambridge, MA, for Stanley Sheppard, Plaintiff.

Douglas I. Louison, Merrick, Louison & Costello, Regina M. Ryan, Merrick, Louison & Costello, Boston, MA, for Town of Burlington, Robert Aloisi, William R. Soda, Defendants.

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DEIN, United States Magistrate Judge.

### I. INTRODUCTION

This civil rights action arises out of the arrest, imprisonment and indictment of the plaintiff, Stanley Sheppard ("Sheppard"), for armed robbery and assault and battery with a dangerous weapon. His criminal case was dismissed by a Massachusetts Superior Court Judge who concluded that relevant evidence had not been presented to the grand jury. Thereafter, Sheppard sued the Town of Burlington, Massachusetts ("Burlington" or the "Town"), and two of its police officers, Robert Aloisi ("Aloisi") and William R. Soda ("Soda"), alleging violations of his constitutional rights and intentional infliction of emotional distress.

The matter is presently before the court on the defendants' motion for summary judgment (Docket No. 27), by which the defendants are seeking summary judgment in their favor on all of the plaintiff's claims. The Amended Complaint alleges five causes of action, including claims for false arrest and imprisonment (First Cause of Action), malicious prosecution (Second Cause of Action), municipal liability (Third Cause of Action), violations of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11 ("MCRA") (Fourth Cause of Action), and intentional infliction of emotional distress (Fifth Cause of Action). In addition, Sheppard alleges that the defendants unconstitutionally searched and seized his motor vehicle and stole his personal property.

The plaintiff has agreed, both in pleadings filed with the court and at oral argument, that all of his claims against Soda and his emotional distress claim against Burlington should be dismissed. For the reasons detailed herein, the defendants' motion for summary judgment as to the remaining claims is ALLOWED.

### II. STATEMENT OF FACTS [1]

The following facts relevant to the defendants' motion are undisputed unless

---

1. The facts are derived from the following materials: (1) the "Defendants Robert Aloisi, William R. Soda and the Town of Burlington's L.R. 56.1 Statement of Material Facts of Record as to Which There is No Genuine Issue to be Tried" (Docket No. 28) ("DF") and exhibits attached thereto ("Defs.' Ex. ___"), (2) the "Plaintiff's Reply to Defendants Robert Aloisi, William R. Soda and the Town of Burlington's L.R. 56.1 Statement of Material Facts of Record as to Which There is No Genuine Issue to be Tried" (Docket No. 33) ("PF") and exhibits attached thereto ("Pl.'s Ex. ___"), and (3) Exhibits attached to the "Plaintiff's Supplemental Opposition to Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment" (Docket No. 39) ("Pl.'s Supp. Memo, Ex.___"). In addition, the court has considered the original security videotape from the Rainforest Café in Burlington and photographs made from portions of the videotape, which were submitted to and viewed by the Massachusetts Superior Court in the criminal proceeding against Sheppard identified as *Commonwealth v. Stanley Shephard,* Middle-

otherwise indicated.[2]

### The Robbery—An Overview

At approximately 12:30 a.m. on October 29, 2000, two armed and masked men robbed the Rainforest Café restaurant at the Burlington Mall in Burlington, Massachusetts. Sheppard was working as the assistant kitchen manager at the Café at the time. It is undisputed that Sheppard had gone outside when he was approached by the two men. He let them in to the restaurant, and led them to the office where the cash was kept. Two co-workers were in the office at the time.

The robbers were armed and masked by the time they entered the office. In the office, Sheppard was told by one of the robbers to get down on the ground, and his hands were duct-taped behind his back. A co-worker, Tracey Stallworth ("Stallworth"), who had been hiding underneath an office desk, became hysterical, and the robbers discovered her presence and hit her over the head. Gregory Potesta ("Potesta"), the assistant manager, was also in the office. He opened the safe. The robbers took the money, hit Potesta over the head, and fled. Potesta, who was injured but not unconscious, called 911. Sheppard freed himself from the duct tape, went outside to look for the police, returned, and then called 911 again. Four police officers, including the defendant Aloisi, Lieutenant Bevis, Officer Priest and Officer Kirchner, arrived at the scene. Stallworth and Potesta were taken to the Lahey Clinic for treatment.

As detailed below, the police believed that Sheppard participated in the robbery voluntarily, and was working with the masked robbers. For his part, Sheppard contends that the police focused on him only because he is black. He contends that he was forced to let the robbers in because they were armed with guns. A Superior Court judge concluded that a surveillance tape could be viewed as showing that Sheppard never had the opportunity to see the robbers unmasked, and that a robber held a gun to his back when he entered the office.[3] Since neither the tape, nor this potential description of events, was presented to the grand jury, the court dismissed the indictments.

### The Investigation

After arriving at the Rainforest Café, Officer Priest interviewed Sheppard. (DF ¶¶ 17, 48). According to Officer Priest, but denied by Sheppard, during the interview Sheppard was reluctant to give his address and stated that he was having a hard time paying his bills as he had no money. (Defs.' Ex. 3 at 9; PF ¶¶ 49–51). Officer Priest contends that he began to suspect that Sheppard had been involved in the armed robbery based on Sheppard's passive and unexcited demeanor during the interview and on the fact that the duct tape, which the robbers had used to tie Sheppard's hands during the robbery, had been loose. (DF ¶ 18; Defs.' Ex. 3 at 31). Officer Priest testified that he relayed all of his suspicions to Aloisi. (DF ¶ 19; Defs.' Ex. 3 at 30–32; PF ¶ 19).

---

sex Superior Court No. 2000–1516. These have been filed with this court along with a cover letter from plaintiff's counsel (Docket No. 37) ("Frisoli Ltr.").

**2.** The court does not credit mere allegations or conclusory assertions that are not supported by specific facts in the evidentiary record. *See Sheinkopf v. Stone,* 927 F.2d 1259,

1262 (1st Cir.1991). Thus, this court's recitation of the undisputed facts does not include facts that are not supported by the referenced sections of the evidentiary record.

**3.** Despite numerous reviews of the relevant tapes and photographs, this court does not find the depictions to be at all clear on these points.

According to Sheppard, the police focused on him almost immediately. (*See* PF ¶ 57; Pl.'s Ex. 2 at 143). He contends that "Officer Priest, who was the first officer to question Shephard [sic] after learning the robbers were black and Hispanic, almost immediately thereafter accused Shephard [sic] of being involved in the robbery." (Pl.'s Mem. (Docket No. 32) at 15). In support of his claim of racial animus, Sheppard contends that he was one of only three black individuals employed at the restaurant, that only 1.36% of the Town's population was African American, that there was only one African American police officer and that the officer had filed complaints of discrimination against the Police Department. (PF ¶¶ 52–54).

The defendant Aloisi has been employed by the Burlington Police Department since 1970, and has been an Inspector since 1975. (DF ¶¶ 3–4). Aloisi also interviewed Sheppard on the night of the robbery. (DF ¶ 26). He incorporated the results of this interview and other information he had gathered from various sources in an incident report dated November 3, 2000. (Pl.'s Ex. 5).

According to Aloisi, Sheppard reported that he had been robbed by two gunmen in the presence of Greg Potesta, the store manager of the Rainforest Café, and Tracey Stallworth, an employee. (DF ¶ 27; Pl.'s Ex. 5 at 2). Sheppard said that he had been taking out the trash/laundry at the rear of the Rainforest Café, and had been approached by two gunmen when he returned to go back into the restaurant. (DF ¶ 28). According to Aloisi's report, Sheppard had told Officer Priest that he was taking out trash, but had told Lieutenant Bevis that he was taking out laundry. (Pl.'s Ex. 5 at 2). Sheppard also told Aloisi that one of the gunmen stated twice, "we want the money." (*Id.*). Aloisi then asked Sheppard how he knew that the gunmen wanted the restaurant's money

and not his money. (*Id.*). "Sheppard responded by saying that one of the gunmen put a gun in his back and he was so nervous that he immediately took them to the office where the cash was." (DF ¶ 31; *see also* Pl.'s Ex. 5 at 2). Sheppard also stated that inside the manager's office, the gunmen told him to get down on the ground and then duct-taped his hands. (DF ¶ 32; Pl.'s Ex. 5 at 2). He was never physically harmed. (Pl.'s Ex. 5 at 5).

After interviewing Sheppard, Aloisi met with Potesta and Stallworth at the Lahey Clinic, where they had been taken after being struck by the gunmen. (DF ¶¶ 25, 34). According to Aloisi's incident report, Potesta told Aloisi, among other things, that the robbers had told him to open the safe, which he did. (Pl.'s Ex. 5 at 2). The report further states, "Greg [Potesta] didn't understand why they asked only him, as if they knew he was the only one that could open the safe." (*Id.*).

Following his meeting with Potesta and Stallworth, Aloisi returned to the Rainforest Café, where he met the restaurant's General Manager, Thomas Stohr ("Stohr"). (DF ¶ 36; Defs.' Ex. 5 at 7). Stohr had the video taping system for the restaurant's security cameras available in his office. (DF ¶¶ 37–39). The video system operated seven days a week, twenty-four hours a day, and recorded images from nine different camera locations throughout the Rainforest Café. (*Id.*; Defs.' Ex. 5 at 24–25). Stohr, Aloisi, Officer Kirchner and the restaurant's Director of Restaurant Services viewed the surveillance videotape of the armed robbery. (DF ¶ 40; PF ¶ 59; Pl.'s Ex. 5 at 3). According to Stohr, Sheppard knew of the existence of the security cameras prior to the robbery. (PF ¶ 60; Pl.'s Ex. 1 at 82–83).

### The Surveillance Videotape

The parties have filed copies of two surveillance videotapes with the court, and all

parties agree that the court may rely on the tapes in addition to their documentary submissions. The videotapes show Sheppard walking through a hallway and out a doorway at the Rainforest Café. (Defs.' Ex. 6; Frisoli Videotape [4]). In one hand he is carrying a bag that appears to contain white material, which is consistent with either linen or trash. (*Id.*). Some minutes later, Sheppard can be seen returning to the restaurant through the door and entering the hallway without the bag. (*Id.*). Two individuals enter the hallway behind Sheppard. (*Id.*). It is not apparent to this court whether their faces are covered or exposed, but their movements later in the videotape adjusting their masks suggest that their faces were uncovered initially. (*Id.*). One of the individuals appears to be holding something, but it is unclear whether it is a gun. (*Id.*). As Sheppard moves through the hallway with his back to the robbers, his arms are raised part way. (*Id.*; Frisoli Ltr., Ex. 1D). At one point, Sheppard turns his head part way to his left, but it is unclear whether he is able to view the robbers' faces. (Defs.' Ex. 6; Frisoli Videotape). When Sheppard reaches the end of the hallway, he turns and continues down another hallway, out of the camera's sight. (*Id.*).

After Sheppard disappears from view, the robbers remain in the hallway. (*Id.*). Their movements are consistent with putting on or adjusting face covers, but this court is not able to interpret their actions with certainty. (*Id.*). Sheppard then returns to the robbers in the hallway, and stands facing them with his back toward the camera. (*Id.*; Frisoli Ltr., Ex. 1E).[5] It appears that one of the assailants is still adjusting his face cover. (Defs.' Ex. 6; Frisoli Videotape). Sheppard then turns, walks around the corner into the other hallway, and moves out of sight. (*Id.*). The robbers follow Sheppard, and one of them appears to stay close to Sheppard's back. (*Id.*).

Thereafter, the videotape shows Sheppard approach the accounting office and begin to open it with what is apparently a key. (*Id.*). The robbers appear to be right behind him, and there is a dark shape against Sheppard's lower back which is consistent with a gun, but also could be a shadow or a hand. (*Id.*; Frisoli Ltr., Ex. 1F).[6] The videotape further shows the robbery taking place inside the accounting office. Sheppard and Stallworth can be seen lying on the floor of the office. (Defs.' Ex. 6; Frisoli Videotape). Potesta and the two robbers can be seen moving around inside the office. (*Id.*).

After the robbery is completed, the robbers leave through the same door that they used to enter the restaurant. (*Id.*; *see also* PF ¶ 55). Sheppard can be seen sitting up and assisting Stallworth. (Defs. Ex. 6; Frisoli Videotape; *see also* PF ¶ 56). Subsequently, Sheppard walks

---

4. "Frisoli Videotape" refers to the original surveillance videotape that plaintiff's counsel submitted to the court under cover of the Frisoli Ltr.

5. Sheppard argues that he returned to where the robbers were because they told him to come back and because the restaurant's manual instructed employees to cooperate in case of an armed robbery. (Pl.'s Mem. at 14). However, there is no evidence that Aloisi ever learned of Sheppard's reason for returning to the robbers.

6. In his deposition in this case, Officer Kirchner testified that he could recall seeing guns when he initially viewed the videotape in 2000. (PF ¶ 61; Pl.'s Ex. 6 at 25–26). Specifically, Kirchner recalled seeing guns "after Mr. Sheppard returns to the two suspects at the back door" and "inside the accounting room when the robbery takes place." (*Id.*). However, it is not at all clear whether there was a gun pointed on Sheppard when he first came into the building with the robbers.

through the hallway and out the same door that was used by the robbers, apparently to see whether the police had arrived in response to Potesta's call. (*Id.*). He then returns to the restaurant, leaving the outside door open, and goes back to the accounting office where he appears to use the telephone. (*Id.*). There is no dispute that Sheppard used the telephone to make a call to 911. (PF ¶ 56; Pl.'s Ex. 2 at 93). Finally, Potesta can be seen opening the outside door and allowing the police into the restaurant. (Defs.' Ex. 6; Frisoli Videotape).

The Café's General Manager, Stohr, after viewing the videotape, told the police officers that the incident and Sheppard's behavior looked "weird." (DF ¶¶ 41, 44). In particular, Stohr told Aloisi that he found it odd that Sheppard did not check to make sure that the door was locked when he returned to the restaurant after going outside following the robbery. (DF ¶ 42; Defs.' Ex. 5 at 85–86). In his view, if Sheppard was afraid of the gunmen, he would have made sure the door was locked. (*Id.*). Stohr also thought it suspicious that Sheppard was the only employee present during the armed robbery who had not been injured. (DF ¶ 47).

At some point, Stohr also informed Aloisi that, according to Stallworth, the kitchen door had been closed at the time of the robbery, blocking the view of those working in the kitchen. (DF ¶ 45). In addition, she reported that Sheppard had received a telephone call just prior to the incident. (*Id.*). Stohr said that he found it unusual for the kitchen door to be closed at that time of night, and advised Aloisi that someone at the restaurant had reportedly seen Sheppard close the door. (DF ¶ 46; Defs.' Ex. 5 at 62–63). He also stated that it was unusual for restaurant employees to receive telephone calls late at night because the calls ordinarily go directly into the voicemail system. (DF ¶ 46; Defs.' Ex. 5 at 62). Sheppard does not dispute the substance of these facts (although he challenges the negative inferences), but he has presented evidence that Aloisi did not receive the information from Stohr until after Sheppard had been arrested. (PF ¶¶ 45, 46; *see also* Pl.'s Ex. 8 and 15).

Aloisi took the surveillance videotape to the Burlington Police Department. (PF ¶ 62; Pl.'s Ex. 7 at 22). Subsequently, he viewed the videotape again, along with his supervisor, Lieutenant Sciuto, and Lieutenant Sciuto made photographs from the tape. (PF ¶¶ 62, 63; Pl.'s Ex. 7 at 22–23; DF ¶ 8).

### The Arrest

Aloisi returned to the Rainforest Café on the afternoon of October 29, 2000 and met with Sheppard. (*See* PF ¶ 64; Pl.'s Ex. 5 at 1–3). Aloisi read Sheppard his *Miranda* rights and asked Sheppard to write an account of what had happened, which he did. (PF ¶ 64; Pl.'s Ex. 5 at 3–4). Aloisi advised Sheppard that based on his viewing of the surveillance videotape, he disagreed with Sheppard's version of events. (*Id.*). He also asked Sheppard if he was willing to take a polygraph test, and Sheppard answered affirmatively.[7] (PF ¶ 65; Pl.'s Ex. 2 at 108). Aloisi then arrested Sheppard for armed robbery while masked and for two counts of assault and battery with guns. (PF ¶ 65; Pl.'s Ex. 5).

Following Sheppard's arrest, the police had the plaintiff's car towed from the Burlington Mall parking lot to the Burlington Police Department without a warrant. (PF ¶ 66; Pl.'s Ex. 6 at 14; Pl.'s Supp. Mem., Ex. 5 at 8). Lieutenant Bevis authorized the impoundment of the vehicle in

---

7. Sheppard testified that no polygraph test ever took place. (Pl.'s Ex. 2 at 108).

order to maintain its security and in order to investigate its contents. (*See* Pl.'s Supp. Mem., Ex. 2 at 23–24).

When Sheppard's vehicle was towed from the parking lot, Officer Kirchner prepared an inventory form on which he noted that the tires were in good condition. (PF ¶ 66; Pl.'s Ex. 6 at 14–15 and Exhibit attached thereto). Officer Kirchner also wrote that the car contained personal property, including a Sony Play Station and VCR. (*Id.*). The towing company records indicate that neither the Sony Play Station nor the VCR was in the car when it was later towed from the Burlington Police Station to a tow lot. (PF ¶ 68). However, according to the plaintiff, the items would have been in the trunk. (*See* Defs.' Reply Mem. (Docket No. 38), Ex. C at 131–32). Sheppard also contends that a leather coat and cellular phone, which he had in the police cruiser when he was arrested, were never returned to him. (PF ¶ 69; Pl.'s Ex. 2 at 111–12). The value of the allegedly missing items seems to be less than $1,000. (Defs.' Reply Mem., Ex. C at 132).

### The Criminal Proceedings

On November 1, 2000, Aloisi testified on behalf of the Commonwealth of Massachusetts in a state district court hearing to determine, pursuant to Mass. Gen. Laws ch. 276, § 58A, whether Sheppard should be released on bail or detained pending his criminal trial. (PF ¶ 70; Pl.'s Ex. 10). In his testimony, Aloisi described what he had seen on the surveillance videotape from the Rainforest Café. (*Id.*). His statements, in substance, were that the robbers did not hold a gun to Sheppard's back, that Sheppard had to have known the robbers because they were not masked when they first approached Sheppard, and that Sheppard had an opportunity to escape, but instead returned to the hallway where the robbers were waiting. (PF ¶ 70; Pl.'s Ex. 10 at 20–23, 27–32, 39–40). At the conclusion of the hearing, the court ordered that Sheppard be held without bail. (Pl.'s Ex. 10 at 63). After Aloisi left the courtroom, the Reverend Bishop Miles, a friend of Sheppard's family,[8] allegedly heard Aloisi state, "the nigger's guilty." (PF ¶ 71; Pl.'s Ex. 11 at 6–11).

Subsequently, on December 5, 2000, Aloisi testified as the only witness before a grand jury in the criminal proceedings against Sheppard. (PF ¶ 72; Pl.'s Ex. 12). Aloisi testified as to what he had observed on the surveillance videotape from the Rainforest Café, but the videotape was not played for the grand jury. (Pl.'s Ex. 12). Thereafter, the grand jury indicted Sheppard. (*See* Attachment to Pl.'s Ex. 13).

On June 18, 2001, the Massachusetts Superior Court held a hearing on Sheppard's motion to dismiss the criminal case against him. (PF ¶ 73; Pl.'s Ex. 13). The presiding judge conducted a frame-by-frame review of the surveillance videotape from the Rainforest Café. (*Id.*). Following the hearing, the Superior Court allowed Sheppard's motion, thereby dismissing all of the indictments against him. (PF ¶ 73). In its Findings of Fact and Conclusions of Law on the motion to dismiss, the Superior Court ruled in relevant part:

At no point is there any evidence that Mr. Shephard (sic) viewed the assailants face to face in any circumstance other than they, the assailants, being masked. Also, there is evidence that at the time that Mr. Shephard (sic) entered the accounting room, a gun was in his back. This gun can be seen clearly in a video frame. And it consists of a black cylinder object pointed in the back of Mr. Shephard (sic), and is consistent with a

---

8. Reverend Miles is apparently no longer available as a witness. (*See* PF ¶ 71)

gun generally and with one of the two guns that were described by other employees as being held and used by the assailants.

This material evidence, that is the lack of opportunity for Mr. Shephard (sic) to view face to face the assailants, and the fact that Mr. Shephard (sic) had a gun in his back, was not properly presented to the Grand Jury.

In point of fact, the claim by the defendant that the integrity of the Grand Jury proceeding was impaired because the Commonwealth failed to present exculpatory evidence and misrepresented facts to the Grand Jury on the indictment in this case is supported.

(PF ¶ 73).

### Burlington's Handling of Complaints Against Aloisi

In or about August 2001, Sheppard served Burlington a notice of the allegations that are the subject of this lawsuit. (Pl.'s Ex. 14 at 23). The Burlington Police Department's policies and procedures provide, *inter alia,* that serious charges of police misconduct will be handled and investigated by an internal affairs officer who is the lieutenant in charge of the Detectives Division. (Pl.'s Ex. 3 at 20–22). Pursuant to the policies and procedures that have been in place since 2000, the Department's internal affairs personnel are responsible for recording, registering and controlling the investigation of complaints against employees, and for supervising and controlling the investigation of alleged misconduct within the Department. (*Id.* at 21–22). Moreover, the Police Department's policies require that all alleged or suspected violations of laws, ordinances, bylaws, department rules, regulations, policies and procedures, and verbal or written orders be investigated according to certain procedures. (*Id.* at 22). Allegations of racial discrimination and violations of civil rights are deemed severe enough to war-

rant consideration by internal affairs. (*Id.* at 34–35). Nevertheless, there has been no investigation by the Police Department's internal affairs personnel regarding Sheppard's arrest or the events that occurred subsequent to his arrest. (*Id.* at 20).

The plaintiff has presented evidence of prior complaints concerning Aloisi's conduct. For instance, in May 1979, a Burlington police officer, Sergeant Knowles, threatened to sue the Town on the grounds that Aloisi allegedly had beaten his son. (Pl.'s Ex. 18). Witness statements that were submitted to the Police Department regarding that incident described how Aloisi allegedly had beaten both Sergeant Knowles' son and a black youth who had been suspected of stealing a car. (*Id.*). As punishment for his "over reaction in dealing with citizens at the incident," the Police Department transferred Aloisi to its Uniform Division. (*Id.*).

Years later, in 1984, a woman filed a written complaint against Aloisi with the Burlington Police Department in which she claimed that Aloisi had wrongly initiated criminal proceedings against her. (Pl.'s Ex. 19). Following an investigation of the complaint, the Chief of Police found no fault with Aloisi's handling of the case. (*Id.*).

Finally, in 1998, Aloisi was named as a defendant in a case in which the plaintiff alleged that Aloisi had deliberately falsified one or more witness statements. (Pl.'s Ex. 20). The docket sheet for the case indicates that the court awarded judgment in Aloisi's favor on Aloisi's motion for a directed verdict. (*Id.*).

### III. ANALYSIS

#### A. Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to in-

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A genuine issue is one that must be decided at trial because the evidence, viewed in the light most flattering to the non-movant, would permit a rational fact finder to resolve the issue in favor of either party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) (internal quotations and citations omitted). A material fact is one that has the "potential to affect the outcome of the suit under the applicable law." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996) (internal citations and quotation omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. *See id.* at 324, 106 S.Ct. at 2553. In evaluating motions for summary judgment, however, the court will not consider " 'mere allegations,' or draw inferences where they are implausible or not supported by 'specific facts.' " *Sheinkopf v. Stone*, 927 F.2d 1259, 1262 (1st Cir.1991). Nor will the court accept conclusory assertions in lieu of documented facts. *Id.* (internal citations omitted).

## B. *Claims Under 42 U.S.C. § 1983*

In his first three causes of action,[9] Sheppard is seeking recovery against Aloisi and the Town under 42 U.S.C. § 1983 for alleged violations of his constitutional rights. Specifically, in his First Cause of Action, Sheppard claims that the defendants violated his constitutional rights by unlawfully arresting him and imprisoning him without probable cause. Sheppard further claims, in his Second Cause of Action, that the defendants deprived him of his constitutional rights by maliciously initiating criminal proceedings against him in state court. Additionally, the plaintiff asserts that he is seeking damages against the defendants, pursuant to 42 U.S.C. § 1983, for the unconstitutional search and seizure of his motor vehicle, vandalism of his motor vehicle, and theft of his personal property. (*See* Pl.'s Mem. at 10). Sheppard's Third Cause of Action, entitled 42 U.S.C. § 1983, alleges that the Town failed to properly train, supervise, investigate and discipline the police officers.

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (quotations and citation omitted). It states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

---

9. While Sheppard has labeled his first and second causes of action simply "false arrest and false imprisonment" and "malicious prosecution," he has alleged therein violations of his constitutional rights. *See* Amended Complaint ¶¶ 29, 32. Moreover, in his pleadings, he does not address these claims under state law. Therefore, these claims will be analyzed under 42 U.S.C. § 1983, and not as state common law claims.

42 U.S.C. § 1983. "A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law [and] second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." *Soto v. Flores*, 103 F.3d 1056, 1061(1st Cir.1997), *cert. denied*, 522 U.S. 819, 118 S.Ct. 71, 139 L.Ed.2d 32 (1997). There is no dispute that Aloisi, the individual defendant, was acting in his official capacity as a Burlington police officer at all relevant times and was therefore acting under color of state law. However, the defendants dispute that any of their conduct deprived Sheppard of his constitutional rights. Moreover, Aloisi argues that even if his conduct was unlawful, he is shielded from liability under the doctrine of qualified immunity.

As detailed herein, this court finds that Sheppard has failed to present evidence to support any of his claims that the Town violated his constitutional rights. With respect to Aloisi, while disputed facts preclude a finding that probable cause for the arrest existed as a matter of law, the § 1983 claims against Aloisi are barred by the doctrine of qualified immunity. Finally, Sheppard has not presented sufficient evidence to support his claim that the defendants violated his constitutional rights by searching and seizing or vandalizing his automobile, or by stealing his personal property.

### C. *Probable Cause for the Arrest*

The defendants contend that Sheppard's claim of false arrest and imprisonment and malicious prosecution must fail because there was probable cause for Aloisi's arrest of Sheppard. However, this court finds that there are disputed facts which preclude the entry of summary judgment on this point as a matter of law.

■ "The Fourth Amendment right to be free from unreasonable seizures of the person demands that an arrest be supported by probable cause." *Santiago v. Fenton*, 891 F.2d 373, 383 (1st Cir.1989). Consequently, "[t]he constitutionality of a warrantless arrest 'depends ... upon whether, at the moment the arrest was made, the officer[ ] had probable cause to make it.'" *Logue v. Dore*, 103 F.3d 1040, 1044 (1st Cir.1997) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)). Probable cause will be found "if—and only if—the facts and circumstances of which the arresting officer has knowledge are sufficient to lead an ordinarily prudent officer to conclude that an offense has been, is being, or is about to be committed, and that the putative arrestee is involved in the crime's commission." *Id.* Accordingly, the standard to apply in evaluating the existence of probable cause and the legality of the ensuing arrest is an objective one; "as long as the circumstances surrounding the event warrant the officer's reasonable belief that the action taken is appropriate, the arrest is justified." [10] *Id.* Finally, "though probable cause requires more than mere suspicion, it does not require the same quantum of proof as is needed to convict." *Id.*

■ In the instant case, Aloisi has articulated facts which would support a finding of probable cause. For example, but without limitation, Aloisi points to the fact that

---

**10.** Because the existence of probable cause is gauged by an objective standard, it is irrelevant whether or not Aloisi was motivated by racism, as Sheppard suggests. Aloisi's decision to arrest Sheppard would be constitutional, notwithstanding any racial animus, if, at the time of the arrest, it was objectively reasonable to conclude that Sheppard was involved in the crime. *See Logue*, 103 F.3d at 1044. In any event, Sheppard has not submitted sufficient evidence to support his claim that Aloisi acted out of bias, and not based on his legitimate interpretation of the evidence.

Sheppard was the only employee who was not injured and his arms were tied only loosely, Sheppard provided inconsistent reasons why he was outside, Sheppard received a phone call before the robbery, Sheppard closed the kitchen door, thereby blocking other employees' view of the office where the armed robbery occurred, his demeanor after the robbery was passive rather than excited, he would not provide his name and address initially, and he stated that he needed money. In addition, Sheppard did not appear to be particularly concerned about locking the outside door after the robbery, and Sheppard's co-worker, Potesta, thought it strange that the robbers seemed to know that he was the only person who could have opened the restaurant's safe, thereby suggesting that a restaurant employee may have provided information to the assailants. Although Sheppard does not refute these factual assertions entirely, he has presented facts which, when viewed in the light most favorable to him, create a dispute as to whether all of this evidence could have supported probable cause for the arrest

Most important to the defendants' probable cause analysis is Aloisi's interpretation of the events depicted on the surveillance tape, which he reviewed before arresting Sheppard. Aloisi contends that the tape indicated that Sheppard had an opportunity to see the robbers without their masks,[11] that Sheppard escorted the robbers to the office, despite having the chance to lose them in the hall, and that, in his view, Sheppard was not being prodded by a gun when the robbers first entered.

This court concludes that a jury could find that Aloisi's interpretation of the videotape was correct. Nevertheless, a Superior Court judge found that the tapes could

be viewed as showing that Sheppard did not have an opportunity to see the robbers' faces, and that he was propelled by a gun to his back. Thus, when viewed in the light most favorable to Sheppard, a jury also could conclude that a reasonable police officer considering the surveillance videotape at the time of the arrest would have determined that Sheppard's actions were motivated only by the threat of harm and not by his participation in the crime.

These conflicting versions of the evidence have raised a genuine issue as to whether there was probable cause for Sheppard's arrest. *See Santiago*, 891 F.2d at 384 (differing version of events leading to arrest precludes the entry of summary judgment); *Woodley v. Town of Nantucket*, 645 F.Supp. 1365, 1370 (D.Mass.1986) (genuine issue of fact concerning probable cause existed where plaintiff's testimony "undercut[s] [defendant police officer's] characterization of the information available to him at the time of the arrest."). Therefore, this court cannot conclude, as a matter of law, that Aloisi had probable cause to arrest the plaintiff for armed robbery and assault and battery. *See id.* ("the probable cause determination—i.e., whether the facts and circumstances warranted a person of reasonable caution and prudence in believing that [the plaintiff] had committed a crime—is left more appropriately to the trier of facts.").

### D. *Qualified Immunity for the Arrest*

Where, as here, a jury could reasonably find that Sheppard was arrested without probable cause and in violation of his Fourth Amendment rights, the next inquiry is whether Aloisi is protected by the doctrine of qualified immunity. *Santiago*, 891 F.2d at 383. This court finds that he

---

11. There is no recording as to what happened outside before the robbers entered. If they were still adjusting their masks inside the building, Sheppard may have seen them putting on the masks outside.

is so protected, and that summary judgment must therefore enter in Aloisi's favor on the false arrest claim.

■ Qualified immunity shields government officials performing discretionary functions from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting *Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738–39). While qualified immunity cannot protect Aloisi from liability if, on an objective basis, no reasonably competent officer would have acted as he did, "if officers of reasonable competence could disagree on [the lawfulness of the alleged conduct], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Thus, the defense of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Id.*

■ The First Circuit, drawing on Supreme Court precedent, has developed a three-part procedure for determining whether a state actor is entitled to qualified immunity. The procedure requires this court to consider

(i) whether the plaintiffs' allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right. *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir.2004). Ordinarily, "proper development of the law of qualified immunity is advanced if courts treat these three questions sequentially." *Id.*

The first two prongs of the test for qualified immunity are easily satisfied with respect to Sheppard's false arrest claim. For the reasons detailed above, the record establishes that the facts, viewed in the light most favorable to the plaintiff, could support a finding that Aloisi deprived Sheppard of his Fourth Amendment rights by arresting him without probable cause. Moreover, the defendant does not seriously dispute that the right to remain free from arrest without probable cause was well established at the time of the incident. *See Santiago*, 891 F.2d at 386 ("[t]he right to be free from unreasonable seizures of the person was well established long before 1983."). Accordingly, in this case, "the question of [Aloisi's] immunity for false arrest turns on whether, without regard to his state of mind, there was probable cause or arguably probable cause to make the arrest." *Id.*

■ The court finds that an objectively reasonable police officer could have believed that Sheppard participated in the crime at the Rainforest Café, and consequently, that there was probable cause to arrest Sheppard for armed robbery and assault and battery with a dangerous weapon. The reasonableness standards that underlie the probable cause and qualified immunity inquiries are not identical; qualified immunity requires a "somewhat lesser showing." *Cox v. Hainey*, 391 F.3d 25, 31 (1st Cir.2004). Thus, "if the presence of probable cause is arguable or subject to legitimate question, qualified immunity will attach." *Id.* Accordingly, even if

Aloisi had no probable cause to arrest Sheppard, he is entitled to qualified immunity unless the arrest was obviously unlawful at the time it was executed. *See Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039 (law enforcement officials should not be held liable where they reasonably but mistakenly conclude that probable cause is present); *Limone*, 372 F.3d at 44 ("the qualified immunity defense should prevail unless the unlawfulness of the challenged conduct was 'apparent' when undertaken.").

For the reasons detailed above, Sheppard's arrest was not obviously unlawful at the time it was made. Even assuming Aloisi improperly interpreted the events depicted on the surveillance video, Sheppard's otherwise suspicious behavior, along with the other indicia of an inside job, compels the conclusion that probable cause was at least arguable. Therefore, qualified immunity shields Aloisi from liability for false arrest and imprisonment. *See Cox*, 391 F.3d at 31.

### E. *Malicious Prosecution*

■ Sheppard also contends that the defendants' malicious prosecution of him resulted in a violation of his constitutional rights. Obviously, if there was probable cause for the arrest, the claim of malicious prosecution would fail. However, as detailed above, there are disputed facts as to whether Aloisi had probable cause to arrest Sheppard.

Nevertheless, the defendants are entitled to summary judgment on this claim. In bringing a § 1983 claim, "it is the plaintiff's burden to identify the specific constitutional right infringed." *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir.2001). "[A] garden-variety claim of malicious prosecution garbed in the regalia of § 1983 must fail." *Id.* (quoting *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 256 (1st Cir.1996)).

Sheppard has made no attempt to meet his burden of identifying the constitutional violation at issue in his malicious prosecution claim. It is well-established that malicious prosecution does not support a claim of a substantive due process violation, so that cannot be the constitutional violation which supports a § 1983 claim. *Id.* (citing *Albright v. Oliver*, 510 U.S. 266, 271 n. 4, 114 S.Ct. 807, 811 n. 4, 127 L.Ed.2d 114 (1994)) ("substantive due process may not furnish the constitutional peg on which to hang a federal malicious prosecution" claim). Moreover, "[i]t is an open question whether the Constitution permits the assertion of a section 1983 claim for malicious prosecution on the basis of an alleged Fourth Amendment violation." *Id.* at 54 and cases cited.

Assuming, *arguendo*, "that malicious prosecution can, under some circumstances, embody a violation of the Fourth Amendment and thus ground a cause of action under section 1983," *id.*, this claim would be barred by the doctrine of qualified immunity. As detailed above, the constitutional right at issue must be clearly established at the time of the putative violation to negate the protection of the qualified immunity doctrine. Given that the question whether malicious prosecution may result in a constitutional violation was "an open question" at the time of Sheppard's arrest in October 2000, the doctrine of qualified immunity bars this claim brought under 42 U.S.C. § 1983.

### F. *Seizure, Vandalism, Theft of Property*

Sheppard contends that the defendants are liable to him pursuant to 42 U.S.C. § 1983 for the unconstitutional search and seizure of his motor vehicle, vandalism of his motor vehicle and theft of his property. As an initial matter, the defendants contend that this claim is not sufficiently

pleaded in the complaint. This court disagrees and finds that the allegations are sufficient to satisfy the liberal notice pleading requirements of Fed.R.Civ.P. 8(a). *See Torres–Rivera v. O'Neill–Cancel,* 406 F.3d 43, 49 (1st Cir.2005) ("[t]here is no heightened pleading requirement for section 1983 ... claims"; allegations contained in the complaint need only provide notice of plaintiff's claims). For example, Sheppard alleges that after his arrest, he "was taken to the Burlington Police Station and his motor vehicle was towed and confiscated by the Burlington Police." (Amended Compl. ¶ 11) He also alleges that when he later recovered his car, "he discovered someone had driven a new nail through one of the tires and the Burlington police had stolen a Sony Play Station with 5 games and an RCA 4 head VCR from the motor vehicle." (*Id.* ¶ 16). In addition, the Amended Complaint reads,

[a]t all times material hereto the Town of Burlington failed to adhere to the Policies and Procedures of its Police Department by conducting any investigation of theft of Stanley Sheppard's personal property by the Burlington Police, the vandalism of Stanley Sheppard's motor vehicle by the Burlington Police, [and] the unconstitutional and illegal towing of Stanley Sheppard's motor vehicle by the Burlington Police ....

(*Id.* ¶ 25). Finally, in each of his five Causes of Action, the plaintiff asserts that as a result of the defendants' actions, he "sustained a loss of personal property and was deprived of his constitutional rights." (*Id.* ¶¶ 29, 32, 36, 40, 44). These allegations provided the defendants with adequate notice of Sheppard's intention to pursue a claim based on the allegedly unlawful towing, search and vandalism of his car and the theft of his possessions.

■ Nevertheless, the defendants are entitled to summary judgment on this claim. It is undisputed that Sheppard's car was towed from a parking lot at the Burlington Mall to the Police Station and then to the AT & T tow lot where it remained for 51 days. (*See* Defs.' Reply Mem. (Docket No. 38) at Ex. A at 25). There is no evidence of a search other than an inventory search, which, contrary to the plaintiff's claim, is authorized by the Burlington Police Department regulations. (*See* Policies & Procedures § 6(c)(vii) (motor vehicle inventory) attached to Pl.'s Supp. Mem. (Docket No. 39)). *See United States v. Hawkins,* 279 F.3d 83, 86 (1st Cir.2002) ("[a] warrantless search is permitted under the Fourth Amendment if it is carried out pursuant to a standardized inventory policy."). The impoundment of the vehicle to safeguard it incident to Sheppard's arrest was not unlawful. *See Vega–Encarnacion v. Babilonia,* 344 F.3d 37, 41 (1st Cir.2003) ("[c]ase law supports the view that where a driver is arrested and there is no one *immediately* on hand to take possession, the officials have a legitimate non-investigatory reason for impounding the car").

■ With respect to the claim of loss of property and damage, there is no evidence that Aloisi had any role in the impoundment or subsequent inventory search of Sheppard's car. Moreover, nothing in the record indicates that Aloisi was responsible for or had any involvement in causing any damage to Sheppard's car or any theft of Sheppard's personal effects. Accordingly, Aloisi cannot be liable for the violation of any constitutional rights stemming from this conduct, and is entitled to summary judgment on this claim. *See Soto,* 103 F.3d at 1061 (for liability to attach under section 1983, the defendant's "conduct must have worked a denial of rights secured by the Constitution").

■ Similarly, the plaintiff has failed to state a claim against the Town relating to the car or loss of personal property. The

plaintiff cites no support for the proposition that the damage he suffered was of such a magnitude to give rise to a violation of his constitutional rights. Furthermore, he has not alleged any pattern or practice on the part of the Town which could give rise to municipal liability. *See* discussion, *infra.* Finally, the Town cannot be held liable under common law for the intentional tort of conversion. *See Kelley v. La-Force*, 288 F.3d 1, 12–13 (1st Cir.2002). Consequently, the defendants are entitled to summary judgment on these claims as well.

### G. *Municipal Liability*

■ In his Third Cause of Action, Sheppard is seeking to hold the Town liable under 42 U.S.C. § 1983. "To make out a case for municipal liability under 42 U.S.C. § 1983, the Supreme Court has repeatedly held that liability can be found only 'where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983.'" *Santiago*, 891 F.2d at 381 (quoting *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989)). Accordingly, Burlington cannot be held liable simply because its police officers deprived the plaintiff of his constitutional rights. Rather, the court requires "a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 1388, 137

L.Ed.2d 626 (1997). Thus, in order to establish municipal liability against Burlington, the plaintiff must "demonstrate both the existence of a policy or custom and a causal link between that policy and the constitutional harm." *Santiago*, 891 F.2d at 381.

The defendants argue that Sheppard has failed to demonstrate the existence of a Town policy or custom that caused a deprivation of his constitutional rights. Sheppard counters that Burlington failed to investigate prior complaints of misconduct against Aloisi, as well as Sheppard's complaints against Aloisi, thereby ratifying Aloisi's treatment of Sheppard and demonstrating deliberate indifference to Sheppard's constitutional rights.[12] These claims are not supported by the record.

First of all, the record demonstrates that at least as of 2000, Burlington had policies and procedures in place providing for the handling and investigation of charges of police misconduct. In particular, the Burlington Police Department had policies providing for the handling and investigation of police misconduct by an internal affairs officer and requiring that all alleged or suspected violations of the law be investigated in accordance with certain procedures. (Pl.'s Ex. 3 at 21–22).

Furthermore, the evidence belies Sheppard's contention that the Town failed to investigate prior complaints of misconduct against Aloisi and therefore has ratified Aloisi's improper conduct. For instance,

---

**12.** Although Sheppard alleged in his Amended Complaint that the Town had a custom or policy of "failing to properly train, supervise, investigate and discipline police officers in the performance of their duties," (Amended Compl. ¶ 34), the plaintiff has presented no evidence and has made no argument in his briefs that Burlington inadequately trained its police officers. Accordingly, any claim based on a failure to train will be deemed waived. *See Kelley*, 288 F.3d at 9 (arguments not briefed are waived); *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir.2000) (once the moving party has met his burden of informing the court of the basis for its motion, the burden shifts to the opposing party "to demonstrate that a trier of fact reasonably could find in [his] favor") (internal quotations and citations omitted). In any event, Sheppard has not submitted any factual evidence to support such a claim.

the record shows that after Sergeant Knowles complained about the alleged beating of his son in 1979, the Police Department obtained witness statements and punished Aloisi. (Pl.'s Ex. 18). Similarly, following the 1984 complaint regarding Aloisi's allegedly wrongful decision to institute criminal proceedings, the Chief of Police conducted an investigation of the matter and concluded that Aloisi had handled the case appropriately. (Pl.'s Ex. 19). Moreover, the plaintiff has provided no evidence to support his argument that the Town failed to investigate the 1998 allegations that Aloisi falsified witness statements, and in any event, the evidence shows that the claims against Aloisi in that case were ultimately dismissed. (Pl.'s Ex. 20). Therefore, nothing in the record concerning the 1998 lawsuit suggests that Aloisi acted improperly or that he had a propensity to do so in the future. Accordingly, even if Burlington did fail to conduct an investigation of the 1998 claims against Aloisi, that failure did not create a risk of future constitutional violations. *See Brown*, 520 U.S. at 411, 117 S.Ct. at 1392 ("[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision."). Thus, the Police Department's alleged failure to conduct an investigation of Sheppard's complaints against Aloisi is not part of a pattern or practice which would support a finding of municipal liability. As a result, Burlington is entitled to summary judgment on all of Shep-

pard's section 1983 claims, including the First through Third Causes of Action and Sheppard's claim of unlawful search and seizure, vandalism and theft.

### H. *Massachusetts Civil Rights Act*

In his Fourth Cause of Action, Sheppard asserts civil rights claims against Aloisi and Burlington pursuant to the MCRA, Mass. Gen. Laws ch. 12, § 11.[13] The court finds that both defendants are entitled to summary judgment on these claims.

 To prevail under the MCRA, the plaintiff "must prove that (1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" *Bally v. Northeastern Univ.*, 403 Mass. 713, 717, 532 N.E.2d 49, 51–52 (1989) (quoting Mass. Gen. Laws ch. 12, § 11H). "The MCRA is coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not, and the derogation of secured rights must occur by threats, intimidation or coercion." *Sietins v. Joseph*, 238 F.Supp.2d 366, 377–78 (D.Mass.2003) (internal quotations and citations omitted). Moreover, "[t]he same qualified immunity standard that applies under § 1983 has also been held to apply to claims under the MCRA." *Kelley*, 288 F.3d at 10. *See also Duarte v. Healy*, 405 Mass. 43, 46, 537 N.E.2d 1230, 1232 (1989). Consequently,

---

**13.** Mass. Gen. Laws ch. 12, § 11H states in relevant part: "Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the

constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured." Mass. Gen. Laws ch. 12, § 11I authorizes civil actions by any person who has suffered the interference or attempted interference of the rights described in § 11H.

"a state official cannot be held liable under the MCRA for discretionary official actions that violate (federal or state) constitutional or statutory rights unless those rights were clearly established at the time of the violation and the official's actions were objectively unreasonable." *Kelley*, 288 F.3d at 10. For the reasons detailed above, Sheppard cannot maintain his claims of constitutional violations against either of the defendants. Therefore, the defendants' motion for summary judgment on the plaintiff's MCRA claim is allowed.

### I. *Intentional Infliction of Emotional Distress*

■ Finally, Aloisi is seeking summary judgment in his favor on the plaintiff's Fifth Cause of Action, which asserts a claim for the intentional infliction of emotional distress. In order to prevail of this claim, Sheppard must show "(1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress." *Howcroft v. City of Peabody*, 51 Mass.App. Ct. 573, 596, 747 N.E.2d 729, 747 (2001) (quoting *Cady v. Marcella*, 49 Mass.App. Ct. 334, 340, 729 N.E.2d 1125, 1131 (2000) (internal quotations and citation omitted)). Moreover, "[t]o be considered extreme and outrageous, the defendant's conduct must be beyond all bounds of decency and ... utterly intolerable in a civilized community." *Id.* (internal quotations and citations omitted).

■ The court concludes that Aloisi's conduct cannot be deemed extreme and outrageous. While "[i]t is reasonable to conclude that, for most people, arrest is a traumatic experience, especially if the charges later prove to be false.... [T]his factor alone does not give rise to a claim

for intentional infliction of emotional distress ...." *Finucane v. Town of Belchertown*, 808 F.Supp. 906, 911 (D.Mass.1992). Here, where probable cause was at least arguable, and a reasonably objective police officer could have determined, based on the evidence that was available at the time of the arrest, that Sheppard participated in the armed robbery, this court finds that Aloisi's conduct cannot be deemed extreme and outrageous.

### IV. CONCLUSION

For all the reasons detailed herein, the defendants' motion for summary judgment (Docket No. 27) is ALLOWED.